**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATIE PATTERMANN, MYKAYLA PAGE, FERNANDO MARCELO LOPEZ, JOANN CHAMPAGNE, MALLORY FLANNERY, LAURA ANN OWENS, and TODD JONES, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:24-cv-12031 |
| NATIONAL POTATO PROMOTION BOARD d/b/a/ POTATOES USA; CIRCANA, LLC; LAMB WESTON HOLDINGS, INC.; LAMB WESTON INC.; LAMB WESTON BSW, LLC; LAMB WESTON/MIDWEST, INC.; LAMB WESTON SALES, INC.; MCCAIN FOODS LIMITED; MCCAIN FOODS USA, INC.; J.R. SIMPLOT CO.; J.D. Irving, Limited (JDI) d/b/a CAVENDISH FARMS, and CAVENDISH FARMS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs Katie Pattermann, Mykayla Page, Fernando Marcelo Lopez, JoAnn Champagne, Mallory Flannery, Laura Ann Owens, and Todd Jones, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants National Potato Promotion Board d/b/a Potatoes USA ("NPPB"); Circana, LLC ("Circana"); Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. (collectively, "Lamb Weston"); McCain Foods Limited and McCain Foods USA, Inc. (collectively, "McCain Foods"); J.R. Simplot Co. ("JRS"); and J.D. Irving, Limited (JDI) d/b/a Cavendish Farms, and Cavendish Farms, Inc. (collectively, "Cavendish") (taken together, "Defendants"), as follows:

1

## I.    INTRODUCTION

1.    Plaintiffs bring this antitrust case on behalf of end user purchasers of frozen potato products[1] against NPPB, a major trade association, and the four largest processors of potatoes – Lamb Weston, McCain Foods, JRS and Cavendish (the "potato cartel") – for entering into an unlawful conspiracy to raise, stabilize, fix and/or otherwise manipulate the prices in the market for the frozen potatoes in the United States (the "Relevant Market").  As a result of Defendants' conduct as early as January 1, 2021 through the present day ("Class Period"), consumers, like Plaintiffs Govea and Class members, have paid supracompetitive prices for FPPs at retail.

2.    Defendants have entered a conspiracy to artificially raise prices in the Relevant Market by using conduits to price-fixing, such as potato price data aggregation services (namely, Circana, LLC's "PotatoTrac") and collective action through trade associations like NPPB. Armed with the same access to each other's data on pricing and other sensitive information, as well as with a direct line of communication to each other, the potato cartel moves prices skyward in lockstep – harming all purchasers of potatoes in the process.  During the conspiracy period, a former senior director for McCain Foods stated that McCain was essentially unwilling to compete with Lamb Weston on significant portions of the FPP market (the price of battered French fries), stating "the higher ups" advised against it.  Indeed, JRS's director of sales stated that, when customers threatened to switch to another member of the potato cartel that "we knew but we weren't worried about it."

3.    According to at least one other antitrust action, Lamb Weston issued a directive to employees involved in potato cartel conduct, asking managers at the company to refrain from emailing information about competitor pricing and business intelligence – and, instead, use texting

---

[1] Frozen potato products include frozen French fries, hash browns, tater tots and other frozen potato products (collectively, "FPPs").

in the event of an antitrust investigation. Due to the potato cartel's acts, in defiance of basic economic principles, FPP prices have soared compared to input costs during the conspiracy period:



Frozen Potato Prices (LHS) Compared to Potato Processing Cost Index (RHS), Jan 2010 – Jul 2024

4.      As a result of the foregoing, Plaintiffs bring this Action, on behalf of themselves and all other end user indirect purchasers who bought FPPs from January 1, 2021 through the present. Plaintiffs and Class members seek actual and treble damages, declaratory and injunctive relief – specifically, injunctive relief ending the potato cartel's conduct, disgorgement of profits into a constructive trust under the doctrine of unjust enrichment, reasonable costs and attorneys' fees, pre- and post-judgment interest and any other relief this Court deems just and proper.

## II.      JURISDICTION, VENUE AND INTERSTATE COMMERCE

5.      Plaintiffs bring this Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to remedy violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as under the state antitrust laws and the doctrine of unjust enrichment, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337 and 1367. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert claims arising under the federal antitrust laws, as Plaintiffs bring this Action to remedy violations of the Sherman

Act. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

6. Additionally, this Court also has subject matter jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act of 2005 ("CAFA"). *See* 28 U.S.C. § 1332(d). This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000 (exclusive of costs and interest), there are more than 100 putative members of the Class and minimal diversity exists between the litigants, as one or more of the Class members is a different citizen than Defendants.

7. This Court has personal jurisdiction over the litigants because Defendants Circana and McCain Foods are headquartered here, Defendants transacted business in this District and a substantial portion of the activity at issue in this case occurred here, in this District. This Court also has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k) and 15 U.S.C. § 22, which permit bringing an antitrust lawsuit against any corporation in any district where that corporation may be found or transacts business as well as allows process in such cases to be served in any district where that corporation may be found.

8. Venue is proper in this District because Defendants transacted business in this District and a substantial portion of the activities at issue in this case occurred in this District. Furthermore, McCain Foods has its principal place of business located in Oak Brook, Illinois, which is in this District.

9. Defendant's conduct as alleged herein substantially impacts interstate trade and commerce by harming competition and consumers alike by raising prices, restricting output and throttling innovation.

### III.    PARTIES

10.    Plaintiff Katie Pattermann is a resident of Kendall County, Illinois and citizen of the United States. During the Class Period, Plaintiff purchased FPPs for personal or household use at Jewel-Osco Grocery Store in Yorkville, Illinois. As such, Plaintiff is an indirect purchaser of FPPs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiffs would have paid a more competitive price for FPPs at retail than she otherwise did.

11.    Plaintiff Mykayla Page is a resident of Ogle County, Illinois and citizen of the United States. During the Class Period, Plaintiff Page purchased FPPs for personal or household use at Aldi Grocery Stores in Rochelle, Illinois. As such, Plaintiff is an indirect purchaser of FPPs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiffs would have paid a more competitive price for FPPs at retail than she otherwise did.

12.    Plaintiff Fernando Marcelo Lopez is a resident of Riverside County, California and citizen of the United States. During the Class Period, Plaintiff purchased FPPs for personal or household use at Walmart, Stater Bros., Albertsons, and Castaneda's Markets in California.  As such, Plaintiff is an indirect purchaser of FPPs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiffs would have paid a more competitive price for FPPs at retail than she otherwise did.

13.    Plaintiff JoAnn Champagne is a resident of Washington County, Minnesota and citizen of the United States. During the Class Period, Plaintiff purchased FPPs for personal or household use at Target in Minnesota. As such, Plaintiff is an indirect purchaser of FPPs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and

collective conduct. But for Defendants' conduct, Plaintiffs would have paid a more competitive price for FPPs at retail than she otherwise did.

14.     Plaintiff Mallory Flannery is a resident of Dallas County, Iowa and citizen of the United States. During the Class Period, Plaintiff purchased FPPs for personal or household use at Costco and Walmart in Iowa. As such, Plaintiff is an indirect purchaser of FPPs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiffs would have paid a more competitive price for FPPs at retail than she otherwise did.

15.     Plaintiff Laura Ann Owens is a resident of Anderson County, South Carolina and citizen of the United States. During the Class Period, Plaintiff purchased FPPs for personal or household use at Sam's Club in South Carolina. As such, Plaintiff is an indirect purchaser of FPPs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiffs would have paid a more competitive price for FPPs at retail than she otherwise did.

16.     Plaintiff Todd Jones is a resident of Pina County, Arizona and citizen of the United States. During the Class Period, Plaintiff purchased FPPs for personal or household use at Whole Foods and Trader Joe's in Arizona. As such, Plaintiff is an indirect purchaser of FPPs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiffs would have paid a more competitive price for FPPs at retail than he otherwise did.

17.     Defendant National Potato Promotion Board d/b/a Potatoes USA is a business entity with its principal place of business located in Denver, Colorado at 3675 Wynkoop Street. NPPB is a trade association that, amongst its many members, includes the four members of the potato

cartel, Lamb Weston, McCain Foods, JRS and Cavendish Farms, as well as other potato growers and importers.

18.    According to NPPB, NPPB's mission is "to strengthen the demand for potatoes."[2] One of NPPB's major initiatives on behalf of its growers and importers is to "coordinate regional, national and even international research efforts to collect potato-related data[.]"[3] The reason for this is to "analyze potato volumetric data" to "help our grow partners understand [consumer] demand."[4] Ultimately, NPPB's goal is to "grow our entire industry beyond our wildest imaginations."[5] NPPB also offers export assistance called the "Market Access" program, research resulting in "higher yields and reduced inputs" for FPP producers, and joint marketing programs.[6]

19.    NPPB also uses Circana's data to disseminate information that influences the industry to take certain actions, like adjusting pricing.  NPPB does this by combining Circana retailer pricing data with press releases to show general directions for which way sales are going. For example, on June 6, 2023, NPPB released the following press release information: "[p]otato retail sales increased 16% in sales but decreased in volume by -4.4% from January – March 2023 […] [a]ll categories of potatoes increased in dollar sales, with the most significant occurring for potatoes by 41.9%."[7]  Regular press releases like this one, as well as access to Circana's retailer data, helps to inform the potato cartel which direction to move pricing and by what amount.

---

[2] https://potatoesusa.com/about/what-we-do/ (last accessed, Nov. 16, 2024).
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] https://potatoesusa.com/wp-content/uploads/2019/12/What-is-Potatoes-USA-Doing.pdf (last accessed Nov. 20, 2024).
[7] *Id.*

20.     Indeed, NPPB's efforts lead to higher priced potatoes according to econometric analysis by Timothy J. Richards of Arizona State University.[8] The study states:

> Over the 2016-2020 study period, potato shipments were initially stable, and then declined substantially. Grower prices, however, remained high… While 2020 likely represented an outlier in terms of market demand for potatoes, in general, marketing activities funded by [NPPB] may have prevented a steeper decline.

21.     The study concludes, "[w]e find that all [NPPB] activities were effective in raising demand when controlling for the effect of prices, seasonality and changes in production conditions and other factors relevant to the demand for fresh potatoes and processed potato products."[10] Put differently, the acts of NPPB help to stabilize the effect of mitigating factors and confounding variables, like a drop in demand, for the potato cartel.

22.     Defendant Circana, LLC is a Delaware limited liability company with its principal place of business located in Chicago, Illinois.

23.     Following the August 2022 merger of two data analytics firms, Information Resources, Inc. and The NPD Group, Circana was created. Circana "is the leading advisor on the complexity of consumer behavior. Through unparalleled technology, advanced analytics, cross-industry data and a deep expertise, Circana provides clarity that helps clients take action and unlock business growth."[9]

24.     PotatoTrac is designed, maintained and/or otherwise affiliated with Circana and Circana's predecessor, The NPD Group. PotatoTrac enabled competitors in the Relevant Market, including the potato cartel defendants, to directly exchange data in an effort to control supply,

---

[8] https://potatoesusa.com/wp-content/uploads/2022/07/2022-Potatoes-USA-Evaluation-Study.pdf (last accessed, Nov. 16, 2024).
[9] https://www.circana.com/intelligence/press-releases/2023/news-press-releases-iri-and-npd-rebrand-as-circana/ (last accessed, Nov. 20, 2024).

costs and downstream pricing through the collection and standardization of their data to monitor or discipline co-conspirators within the potato cartel. PotatoTrac's detailed reports provide competitors with a view of the entire market, removing questions of competition on price. Beyond the pricing reports themselves, PotatoTrac allows processors to understand the market using colorful graphs and other helpful graphics to highlight price directions.

25.     Defendant Lamb Weston Holdings, Inc. is a Delaware corporation with its principal place of business in Eagle, Idaho. Lamb Weston Holdings, Inc. owns and operate several U.S. subsidiaries including Lamb Weston, Inc. (a Delaware corporation), Lamb Weston BSW, LLC (a Delaware limited liability company), Lamb Weston/Midwest, Inc. (a Washington corporation) and Lamb Weston Sales, Inc. (a Delaware corporation). These subsidiaries are owned as a unitary enterprise.

26.     These subsidiaries are used to manufacture, price and sell FPPs in the Relevant Market. Lamb Weston's segment sales for 2023 exceeded $4.2 billion. Upon information and belief, Lamb Weston's market share for FPPs in the Relevant Market is approximately 40%.

27.     Defendant McCain Foods Ltd. is a corporation organized under the laws of Canada with its principal place of business in Toronto, Canada.

28.     Defendant McCain Foods USA, Inc., a subsidiary of McCain Foods Ltd., is responsible for McCain Foods' U.S. operations and is a Maine corporation with its principal place of business located in Oakbrook Terrace, Illinois.

29.     Upon information and belief, McCain Foods' market share for FPPs in the Relevant Market is approximately 30%. McCain Foods boasts that one of every four French fries in the world is "a McCain Foods French fry."

30.     Defendant J.R. Simplot Company is a Nevada corporation with its principal place of business located in Boise, Idaho.

31.     Upon information and belief, JRS' market share for FPPs in the Relevant Market is approximately 20%.

32.      Defendant J.D. Irving, Limited (JDI) d/b/a Cavendish Farms is a Canadian corporation with its principal place of business located in Saint John New Brunswick, Canada.

33.     Defendant Cavendish Farms, Inc. a subsidiary of Cavendish Farms Ltd., is responsible for Cavendish Farms' U.S. operations and is a Delaware corporation with its principal place of business located in North Dakota.

34.     Upon information and belief, Cavendish Farms' market share for FPPs in the Relevant Market is between 7% and 8%.

## IV.     FACTUAL ALLEGATIONS

### A. Relevant Market

35.     Insofar as Plaintiffs is required to plead the relevant product and geographic markets to establish antitrust standing for the violations alleged herein, Plaintiffs alleges the relevant markets at issue and have pleaded how Defendant's conduct harmed competitive processes in these markets.

36.     The Relevant Geographic Market is the United States.

37.     The Relevant Product Market is the market for frozen potato products.

38.     According to the National Potato Council, the potato sector within the food industry contributed over $100 billion to the United States economy in 2021. Approximately 39% of all potatoes grown in the United States are frozen and become part of the Relevant Market for downstream consumption by everyday Americans.

10

39. FPPs are a distinct product. FPPs provide advantages to consumers insofar as they allow those consumers to keep potato products for longer periods of time (because they are frozen) as opposed to fresh potatoes. FPPs provide practical advantages as well, allowing downstream users to more easily utilize potato products with less need to prepare them. Downstream purchasers include the food service sector (which is the largest buying segment for processed potatoes), followed by restaurants, hotels, schools and hospitals.

40. The Relevant Market is highly concentrated, as the four potato cartel defendants represent nearly all of the production of FPPs in the United States. Upon information and belief, the market share of each member of the potato cartel is as follows: Lamb Weston 40%; McCain 30%; JRS: 20%; Cavendish: 7-8%.

41. The Relevant Market satisfies the hypothetical monopoly test for market definition used by the federal antitrust enforcement agencies known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%) non-transitory increase in price (a "SSNIP"), without causing a significant number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If not, the market is too narrowly defined and it does not encompass sufficient economic substitutes.

42. Here, the SSNIP test is satisfied, and the market is properly defined. As described above and below, the potato cartel defendants were able to increase the price of potatoes exponentially over the class period – despite these price increases, the members of the potato cartel have not lost market share. In 2023, a former vice president at Lamb Weston stated that Lamb Weston, JRS and McCain "have never seen margins this high in the history of the potato industry."

43.     The reason: an unwillingness by the potato cartel defendants to compete on price. He stated that the three were seeing these high margins because the horizontal competitors have "no incentive to fight that hard for each other's [market] share" and because each of the potato cartel defendants were "behaving themselves."

**B.  The Potato Cartel Violates the Sherman Act**

44.     Defendants acted in concert to fix, raise, maintain and/or stabilize the price of FPPs that they manufactured, distributed, sold or imported into the United States. Beginning as early as January 1, 2021, the way that the Defendants have been able to fix prices in the Relevant Market is by using conduits to price-fixing, such as potato price data aggregation services (including Circana, Inc.'s "PotatoTrac") and collective action through trade associations like NPPB.

45.     Since as early as 2008, and continuing into the present day, Circana (f/k/a NPD, Inc.) collected and collects sensitive, proprietary pricing data on "all potato products moving from manufacturers to food service outlets – restaurants, schools, hospitals and the like."[10] Dissimilar to "retail scanner data," PotatoTrac data is "instead gathered via a survey of food service suppliers."[11]  Indeed, a 2008 Q3 PotatoTrac report described PotatoTrac as "a cooperative, wholesale and foodservice measurement service providing [individual item] level data for all frozen potato shipments from the four major frozen potato processors – Cavendish, Lamb Weston, McCain and JRS – to all U.S. foodservice customers as well as foodservice exports from the U.S. to foreign countries."  The report continues, "[t]he data collected is categorized, and combined totals are played back to … those four processors[.]"[12]

---

[10] https://potatoesusa.com/wp-content/uploads/2019/12/2017-Potatoes-USA-Evaluation.pdf (last accessed Nov. 20, 2024); https://www.potatopro.com/nl/news/2010/us-frozen-potato-sales-still-lag (last accessed Nov. 20, 2024).

[11] http://dairyprogramhearing.com/getfile65226522.pdf?dDocName=STELPRDC5088455 (last accessed Nov. 20, 2024).

[12] https://www.potatogrower.com/2009/02/potatotrac-reports-give-marketing-data (last accessed

46.     Using this aggregated pricing data, the Defendants have been able to coordinate prices and move in lockstep to continue to artificially inflate the price of FPPs by ensuring that no price competition takes place, for example:

a.   In February of 2021, McCain announced price increases which were soon matched by JRS and Cavendish Farms.

b.   In September of 2021, Lamb Weston increased prices and Lamb Weston's then- vice president correctly predicted that McCain would be pleased with the price increase and would follow in tandem, "it will probably be the exact same price increase that McCain wanted … they will announce a price increase."

c.   On February 11, 2022, Lamb Weston increased prices again, which would take effect in April of 2022.

d.   On February 15, 2022, JRS and McCain both announced the exact same price increase.

e.   On February 16, 2022, Cavendish farms announced an identical price increase of their own.

f.   In April of 2022, Defendants increased prices in lockstep once again. JRS's director of sales at the time stated about moving prices in tandem with their competitors, "that's what we did … like Lamb, they did [an increase] like we did[.]"

g.   In May of 2022 and July of 2022, JRS increased prices again – and Lamb Weston followed suit with a similar price increase in July of 2022.

---

Nov. 20, 2024).

h. In 2023, JRS's director of sales stated that JRS, McCain and Cavendish were continuing to "push pricing" and would "not [go] after new business" in response to Lamb Weston increasing prices by as much as 35%. Lab West's former vice president of international business stated that the Defendants "have never seen margins this high" in the potato industry and that Defendants have "no incentive to fight that hard for each other's [market] share." He stated that Defendants were "behaving themselves" in order to maintain high margins and that "… [Defendants] have done a pretty good job at taking margins with these price increases."

i. In 2024, a former senior director at McCain noted that McCain was unwilling to compete with Lamb Weston on pricing and that they should pursue more market share – but that the "higher ups" insisted on not competing.

47. By collusively manipulating FPP prices, each Defendant, acting individually, risks one of its competitors undercutting their prices in order to capture market share. Competition on the merits would not allow for a single FPP producer to exceed certain price thresholds beyond input costs without losing market share due to another competitor undercutting those prices. Thus, Defendants' price increase actions are against their own interests, individually. By acting collusively, Defendants align their interests and follow their collective interest as opposed to their individual interests through collective price increases.

48. All of this was made possible through Circana's PotatoTrac statistical analysis – which would not exist sans each potato cartel member feeding competitive information into it. As such, because each of the potato cartel defendants subscribe to PotatoTrac, they each have agreed to enter a conspiracy to have access to the same data to set and control market-wide pricing.

49.    Defendants also use NPPB as a method to carry out the objectives of the conspiracy. NPPB offers a method for each of the potato cartel defendants to communicate with each other as well as to provide joint marketing, updates on export sales and, most importantly, to facilitate the exchange of data between each of the four producers.

50.    To do this, each potato producer pays an assessment on the amount of potatoes that they produce as well a $0.03 per hundredweight assessment for potatoes that are imported into the United States. Both of these assessments are significant.[13] The first type of assessment, based on the amount of potatoes produced, acts as a method to get each producer to "buy in" to the conspiracy as well as to keep its facilitator financially afloat. The second type of assessment is a penalty against importation which acts as a financial deterrent to inhibit increased supply (which would drive down prices) in the Relevant Market.

51.    Critically, NPPB gives access to PotatoTrac data through quarterly reports, which allows a wider swath of potato-related entiteles to participate in the lockstep movement of prices to supracompetitive levels.

52.    Currently, the way that NPPB provides access to PotatoTrac data is through high-level quarterly reports which appear as follows:

---

[13] https://potatoesusa.com/about/assessment-faqs/ (last accessed Nov. 20, 2024).



## C. Harm to Competition and to Consumers

53.     The price of FPPs became substantially and artificially elevated during the Class Period as a result of Defendants' conduct.  This was contrary to pricing patterns prior to the Class Period and is contrary to the fact that input prices for FPPs dropped significantly at the same exact time.

54.     FPPs are an inelastic good.  Potatoes cannot be replaced.  As such, consumers are forced to pay supracompetitive prices for FPPs and have been throughout the Class Period.  As an intended consequence of Defendants' conduct, consumers have had to pay higher prices for FPPs in the Relevant Market.  Additionally, consumers have been harmed by the lack of price competition between the potato cartel defendants.  This is because the potato cartel defendants, having decided to manipulate and coordinate prices in lockstep, have throttled any incentive to compete on price, quality, service or other types of innovation.

55.     In a market free of the Defendants' conduct, other competitors in the Relevant Market would be more equipped to compete.  However, due to the conduct of Defendants, the artificial prices for FPPs leave competitors unable to penetrate the Relevant Market.

56.     During the Class Period, the price of potatoes has increased by as much as 43% at retail.  Between July 2023 and June 2024, the most significant increase in dollar sales amongst the categories of potatoes sold was FPPs at 14.6%. According to NPPB, using PotatoTrac, this was due to "sharp increases in price for frozen products."[14] Consumers, including Plaintiffs, paid higher prices for FPPs and continue to pay higher prices for FPPs as a result of the potato cartel's conduct.

### D.  Capper Volstead Immunity Does Not Apply

57.     Passed in 1922 as the Co-operative Marketing Associations Act (P.L. 67-146), 7 U.S.C. §§ 291, 292, the Capper-Volstead Act grants certain agricultural producers an exemption under the antitrust laws when these producers are acting "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products. Capper-Volstead Act, § 1. These agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes." Id.

58.     The Capper-Volstead Act allows these producers, as part of the cooperative association, to agree on prices and terms of sale, engage in joint marketing activity, agree on common marketing practices with other cooperatives, engage in other combined activities to promote market efficiency, which absent the Act, would run afoul of the Sherman Antitrust Act.

59.     Immunity under the Capper-Volstead Act is not absolute; it extends only to organizations or cooperatives whose membership consists exclusively of producers of agricultural products and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members.

60.     Further, Capper-Volstead requires that protected cooperatives be "operated for the mutual benefit of the members thereof" and limits the immunity provided by the Act to

---

[14] https://potatoesusa.com/news-events/frozen-potato-demand/ (last accessed Nov 17, 2024).

cooperatives that afford equal corporate suffrage rights to its members, providing "that no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein." The limited protections of the Capper-Volstead Act evaporate unless the organization engaging in the coordinated efforts is exclusively made up of producers. If even one member of a cooperative organization is not a producer, the limited protection of the Capper-Volstead Act will not apply. Even if an individual producer independently qualifies as a Capper-Volstead entity, that individual producer loses Capper-Volstead immunity upon conspiring with a non-Capper-Volstead entity.

61. The plain language of the Capper-Volstead Act affords no immunity for pre-production output restraints: Congress did not grant the cooperatives the power to restrict supply, only the power to assist producers in marketing the available supply of agricultural products. USDA itself has recognized in various published documents that it is illegal for cooperatives to restrain members' production.

62. The activities of the potato cartel and its members, including Defendants, were anticompetitive and predatory. The Defendants' conduct does not include activities that promote market efficiency and have no legitimate business justification. The sole purpose of the conspiracy is to artificially increase the downstream sales price of FPPs in the United States.

63. Additionally, NPPB consists of members whom are importers, and, therefore, are non-Capper-Volstead protected entities. Further, the potato cartel defendants each participate in the downstream processing, marketing and transportation of their products, which means that they are not Capper-Volstead protected entities either.

## V.    CLASS ACTION ALLEGATIONS

64.    This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals. The nationwide class Plaintiffs seeks to represent is defined as follows:

> **Nationwide Class.** All persons who indirectly purchased FPPs for personal or household use in the United States from January 1, 2021 to the present.

Plaintiffs also seek to represent the following statewide sub-class:

> **State Sub-Class.** All persons who indirectly purchased the Defendants' FPPs for personal or household use in in Arizona, California, Connecticut, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia and Wisconsin from January 1, 2021 to the present.

65.    Excluded from the Classes are (1) Defendant and Defendant's subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; (2) Plaintiffs' counsel; and (3) all judges assigned to hear any aspect of this litigation as well as their immediate family members.

66.    *Numerosity.* Both the Nationwide Class and the State Class are so numerous that joinder would be impracticable.

67.    *Commonality.* There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

> i.    Whether Defendants violated the federal and state antitrust laws;
>
> ii.    Whether Defendants engaged in anticompetitive conduct;
>
> iii.    Whether Defendants were unjustly enriched;

iv.   Whether Plaintiffs was harmed;

 v.   Whether Plaintiffs are entitled to declaratory relief and injunctive relief to end Defendant's conduct; and

vi.   Whether Plaintiffs and Class members are entitled to damages and other relief.

68.     *Typicality.*  Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, were harmed by way of the anticompetitive conduct alleged herein.  Plaintiffs, like all other Class members, were injured by Defendants' uniform conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiffs. The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

69.     Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in antitrust class action litigation, and Plaintiffs intend to prosecute this action vigorously.

70.     Superiority of Class Action.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be

adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

71.     The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

72.     Adequate notice can be given to Class members directly using information maintained in the parties' records.

73.     *Predominance.* The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

74.     This proposed class action does not present any unique management difficulties.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE SHERMAN ACT –**
**SECTION 1 RESTRAINTS OF TRADE**
**(FOR INJUNCTIVE RELIEF)**
**NATIONWIDE CLASS AGAINST THE POTATO CARTEL**
**DEFENDANTS AND NPPB**

75.     Plaintiffs realleges and repeats each and every allegation set forth above as if fully realleged and set forth herein.

76.     From at least January 1, 2021, until the effects of their unlawful conduct cease, Defendants entered into and engaged in a contract, combination, conspiracy or agreement to unreasonably restrain trade in violation of the Sherman Act.

77. Defendants did this by artificially restraining competition with respect to the price of FPPs sold within the United States; Defendants created a cartel which has caused Plaintiffs and Class members to suffer overcharge damages.

78. There are no procompetitive justifications for Defendants' price-fixing agreements, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

79. Defendants' cartel is unlawful under a *per se* mode of analysis.

80. In the alternative, Defendants' cartel is unlawful under a quick look or rule of reason mode of analysis.

81. Defendants' conduct caused Plaintiffs and Class members to pay supracompetitive prices for FPPs in the Relevant Market.

82. Defendants' conduct has a substantial effect on interstate commerce.

83. Plaintiffs have suffered and will continue to suffer the type of injury that the antitrust laws were intended to prevent. Plaintiffs have also been harmed by loss of competition in the Relevant Market due to Defendant's conduct.

84. Plaintiffs seek injunctive relief, a declaratory judgment as well as costs and attorneys' fees, with respect to this cause of action.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE SHERMAN ACT –**
**SECTION 1 CONSPIRACY TO EXCHANGE**
**COMPETITIVELY SENSITIVE INFORMATION**
**(FOR INJUNCTIVE AND EQUITABLE RELIEF)**
**NATIONWIDE CLASS AGAINST THE POTATO CARTEL**
**DEFENDANTS AND CIRCANA**

85. Plaintiffs realleges and repeats each and every allegation from the foregoing paragraphs as if fully realleged and set forth herein.

22

86.     Beginning at a time currently unknown to Plaintiffs, but as early as 2008 and as late as January 1, 2021, and continuing through the present day, Defendants and their co-conspirators entered into continuing agreement to regularly exchange detailed, timely, competitively sensitive information which is non-public and is about their operations.  This agreement is an unreasonable restraint of trade under the Sherman Act.

87.     The information regularly exchanged by Defendants pursuant to the agreement has consisted and does consist of information about supply, production and pricing of FPPs. Defendants' regular information exchanges through PotatoTrac reflected an independent concerted action between horizontal competitors in the Relevant Market.  Indeed, each potato cartel defendant furnished competitively sensitive information with the understanding it would be reciprocated.  Circana (and before it, NPD) enforced this understanding by requiring Defendants to share data in order to receive comparable data.

88.     The agreement to regularly exchange this information through PotatoTrac about production, supply and price suppressed competition between the Defendants and could not have been done without the assistance of Circana.

89.     Accordingly, Defendants used the data obtained through PotatoTrac to reduce the uncertainty that they would have individually faced from not knowing what their competitors were offering and providing in terms of price in the market for FPPs.  This strategic information was a material factor in the decisions to inflate prices that Plaintiffs paid for FPPs during the Class Period.

90.     Defendants' unlawful agreements to exchange, and the actual decision to exchange, this data was not reasonably necessary to further any procompetitive purpose.  The information exchange has had the effect of (1) reducing and suppressing competition among Defendants in the market for FPPs and (2) inflating the price of FPPs during the Class Period.  As a result of this

conduct, Plaintiffs and Class members have been injured in their business or property by paying artificially inflated prices for FPPs during the Class Period.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE STATE ANTITRUST LAWS**
**RESTRAINTS OF TRADE**
**(FOR DAMAGES)**
**ON BEHALF OF THE STATE SUBCLASS**

91.     Plaintiffs realleges and repeats each and every allegation from the foregoing paragraphs as if fully realleged and set forth herein.

92.     The anticompetitive conduct as alleged herein violates the state antitrust laws of the following states for the same reason that they violate federal antitrust laws.

**Arizona's Uniform State Antitrust Act**

93.     As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

94.     Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

95.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**California's Cartwright Act**

96.     As  set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

97.     Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

98.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**Connecticut's Antitrust Act**

99.     As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

100.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

101.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**Florida's Deceptive and Unfair Trade Practices Act**

102.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

103.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

104.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**Illinois' Antitrust Act**

105.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

106. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

107. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**Iowa's Competition Law**

108. As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

109. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

110. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**On Kansas' Restraint of Trade Act**

111. As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

112. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

113. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**Minnesota's Antitrust Law**

114. As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

115. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

116. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**Mississippi's Antitrust Statute**

117. As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

118. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

119. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**The Nebraska Junkin Act**

120. As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

121. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

122.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### Nevada's Unfair Trade Practices Act

123.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

124.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

125.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### New Hampshire's Antitrust Statute

126.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

127.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

128.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### The New Mexico Antitrust Act

129.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

28

130.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

131.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**New York's Donnelly Act**

132.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

133.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

134.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

**The North Carolina General Statutes**

135.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

136.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

137.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## The North Dakota Uniform State Antitrust Act

138.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

139.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

140.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## Oregon's Antitrust Law

141.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

142.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

143.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## The Puerto Rican Anti-Monopoly Act

144.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

145.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

146. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## The Rhode Island Antitrust Act

147. As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

148. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

149. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## South Dakota's Antitrust Statute

150. As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

151. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

152. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## The Tennessee Trade Practices Act

153. As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

154.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

155.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### The Utah Antitrust Act

156.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

157.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

158.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### Wisconsin's Antitrust Act

159.    As set forth herein, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

160.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

161.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## ON BEHALF OF THE NATIONWIDE CLASS

162.    Plaintiffs realleges and repeats each and every allegation from the foregoing paragraphs as if fully realleged and set forth herein.

163.    Plaintiffs and Class members paid higher prices for FPPs in the Relevant Market.

164.    Plaintiffs and Class members paid higher prices that what would have otherwise occurred in a market free of Defendants' conduct.

165.    Plaintiffs and Class members conferred a benefit upon Defendants with their money. Specifically, they paid for FPPs. In exchange for paying for FPPs, Plaintiffs and Class members received FPPs. Defendants knew that Plaintiffs and Class members conferred a benefit which Defendants directly accepted. Defendants profited heavily from these transactions.

166.    Defendants would not have profited as much as they have and continue to profit but for their anticompetitive conduct, for which Plaintiffs and Class members were entirely unaware.

167.    Under principles of equity and good conscience, Defendants should not be entitled to retain the money made through these unconscionable acts.

168.    Plaintiffs and Class members have no other adequate remedy at law.

169.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered injury (and will continue to suffer injury) including in the form of higher prices in the Relevant Market.

170.    Defendants should be compelled to disgorge profits from this unlawful scheme into a common fund or constructive trust, for the benefit of Plaintiffs and the Class members. In the

alternative, Defendants should be compelled to return or refund the amounts that Plaintiffs and Class members overpaid for Defendants' FPPs.

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Certify the Classes, appoint Plaintiffs as the Class's representatives, and their Counsel as Class Counsel;

b. Declare, find, adjudge and decree that the agreement of Defendants is unlawful and violates the federal and state antitrust laws and, therefore, must either result in a permanent divestiture or is enjoined;

c. Award to Plaintiffs the costs of their suit, including reasonable attorneys' fees;

d. Award to Plaintiffs and the Class their damages, in the amount to be determined by a jury, inclusive of treble damages as provided by the antitrust laws;

e. Grant to Plaintiffs and the Classes any such and other relief to which they may be entitled and which this Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

DATED:  Nov. 21, 2024                    Respectfully Submitted,

*/s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
Michael von Klemperer (*pro hac forthcoming*)
Georgia Zacest (*pro hac forthcoming*)
**Fegan Scott LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
312-741-1019
Beth@feganscott.com
Mike@feganscott.com
Georgia@feganscott.com

J. Barton Goplerud
**Shindler, Anderson, Goplerud & Weese P.C**.
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
(515) 223-4567
goplerud@sagwlaw.com

*Attorneys for Plaintiffs and the Proposed Class*